## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| Qadeera Shabazz, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. |
| | : | 1:12-cv-00409-JOF |
| Burlington Coat Factory Warehouse | : | |
| Corporation, a Delaware corporation, | : | |
| et al., | : | |
| | : | |
| Defendants. | : | |

## ORDER

This matter is before the court on Defendants' motion for summary judgment [27].

## I.    Background

### A.    Procedural History and Preliminary Matters

Plaintiff, Qadeera Shabazz, filed suit against Defendants, Burlington Coat Factory Warehouse Corporation and Burlington Coat Factory of Georgia, LLC, on February 7, 2012, alleging that Defendants violated the Fair Labor Standards Act by failing to pay her overtime for hours worked in excess of 40 hours per week. The parties engaged in discovery and Defendants filed the instant motion for summary judgment. The primary point of contention between the parties is whether Defendants are exempt from paying Plaintiff under the requirements of the Fair Labor Standards Act by the "executive

exemption" used for employees who perform management functions. As such, Plaintiff's testimony concerning what she did on a day-to-day basis is highly significant to the case.

For this reason, before reciting the undisputed facts as discerned through discovery, the court must highlight the difficulties raised by the manner in which Plaintiff has "disputed" Defendants' statement of material undisputed facts. Plaintiff filed a declaration in response to Defendants' motion for summary judgment. The court finds this declaration is a transparent attempt to re-write her deposition testimony. It is clear why Plaintiff might want to do that. Her deposition testimony firmly establishes that Plaintiff performed a management function and that Plaintiff believed herself to be a manager and held herself out to others as a manager. The court recognizes that the use of a later-filed declaration to "correct" deposition testimony has become an increasingly popular technique to attempt to fend off motions for summary judgment. The Eleventh Circuit, however, has repeatedly stated that such affidavits must not be considered when they are a "sham" and directly contradict statements made in the deposition. *See*, *e.g.*, *Van T. Junkins & Assoc. v. U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir. 1984). The court highlights below a few examples of the problems inherent in Plaintiff's response.

Throughout her deposition, Plaintiff testified as to managerial tasks she performed. To be sure, Plaintiff also performed non-managerial tasks such as working in receiving or operating a cash register, but Plaintiff repeatedly testifies throughout her deposition that she

2

was responsible for performing managerial tasks at the same time.  Plaintiff attempts to paper over this testimony through a statement in her declaration that "I was often so busy performing the same tasks as hourly employees that I frequently could not perform my managerial tasks and on many occasions the Customer Service Manager and Receiving Manager directly supervised employees while I worked with the hourly employees."  *See* Shabazz Decl., ¶ 7.  Plaintiff was provided with at least five opportunities in her deposition to quantify or describe the time she spent on non-managerial tasks.  She could not do so and never testified in her deposition that she "often" was so busy doing other tasks that she could not perform her managerial tasks.  Plaintiff cannot now file an after-the-fact declaration in which she states she "frequently" could not perform her managerial tasks.  In addition to the fact that this is a contradictory statement, it is also so general as to be unhelpful in light of the very specific testimony she provided during her deposition describing the managerial functions she served.

Nor does Plaintiff's proffered excuse that "[o]pposing counsel questioned me for several hours and pressured me to state specific instances wherein I wore a managerial hat rather than perform hourly tasks" save her.  *See* Shabazz Decl., ¶ 16.  The court has reviewed the entirety of Plaintiff's deposition and there is no evidence that Plaintiff was "pressured" into testifying as to anything.  In fact, as he was wrapping up the deposition, Defendants' counsel asked:

3

Q:      Are there any job duties you performed during the relevant time period
        that we haven't talked about today?

A:      Outside the scope of my management functions, besides from me
        working and receiving, you know –

Q:      We've talked about that, but.

A:      Anything else? I can't say that, no.

Q:      No further questions.

A:      Well, I do want to – I have something to day.  I do have something to
        say.  All I want to say is that this has been long, and even though we
        talked about all of my managerial functions, ***I'm not denying the fact
        that I was a manager*** or, you know, but I was a very good, I think, a
        very good employee associate at Burlington and I did whatever was
        necessary to get the job done, whether it was, like I spoke about me
        wearing hats and everything, like I said, not all my job entailed me
        sitting down at a desk doing managerial functions or anything like that,
        paperwork and everything my job also entailed me – I also took
        responsibility to be on the floor to work, you know, to get whatever I
        needed to get the job done and that required a lot of hours, over the 40
        hours of what I guess, you know, a manager is supposed to work.  So
        I clearly have worked, like I said, a lot of hours.

*See* Shabazz Depo., at 270-71 (emphasis added).  This is not the testimony of a witness who

believed she was being "pressured."[1]

---

[1]On several occasions, Plaintiff's declaration refers to activities she performed when
she worked at Southlake Parkway in 2007.  *See* Decl., ¶ 9.  The relevant time period for
Plaintiff's suit, however, is February 7, 2009 through February 7, 2012.  The fact that
Plaintiff now states she performed only hourly tasks for the first several months she worked
at the store in 2007 is irrelevant to the question at hand.

4

During her deposition, Plaintiff was asked repeatedly whether she could quantify in any way how much of her time was spent on non-managerial tasks. *See* Shabazz Depo., at 225-30. Plaintiff could not offer any qualification. *Id.* Yet, in response to Defendants' motion for summary judgment, Plaintiff's counsel wrote: "Tellingly, in seven hours of questioning, defense counsel never asked Ms. Shabazz how much time she spent performing non-managerial tasks versus managerial tasks." *See* Response, Docket Entry [29], at 12. When Defendants' counsel pointed out that Plaintiff had indeed been asked this question during the deposition – five times, no less – Plaintiff's counsel characterized the inclusion of this statement as a "scrivener's error." *See* Notice, Docket Entry [37]. A scrivener's error is defined as an "error resulting from a minor mistake or inadvertence" an example of which is described as "omitting an appendix from a document" or "typing an incorrect number." *See* Black's Law Dictionary 622 (9th ed. 2009). This entire case rises and falls on what types of duties Plaintiff performed and how much time was taken up by particular tasks. The error of Plaintiff's counsel was not minor.

Plaintiff prepared a resumé after she was terminated from her job at Burlington. In that resumé, Plaintiff describes her Burlington job duties as: "responsible for the day to day management of an 11 million dollar retail operation," "coordinating, staffing, payroll, and scheduling for over 100 associates," "supervised: Accounting Manager, Shipping and Receiving Manager, and the Loss Prevention Manager, and the Customer Service

5

Supervisors," and "excellent Trainer, trained over 500 associates in the day-to-day operations of Burlington Coat Factory stores." *See* Defendant's Statement, ¶ 35.

In her later-filed declaration, Plaintiff attempts to explain away this resumé by stating her resumé includes "the managerial duties of my job description while at Burlington Georgia. My resumé, however, does not reflect the fact that, in reality, I spent the majority of my time on hourly tasks while working with Burlington Georgia." *See* Shabazz Decl., ¶ 18. This statement again directly contradicts Plaintiff's deposition testimony where she specifically testified that her resumé honestly reflected her job duties. Plaintiff made no comment in her deposition that she was only copying on her resumé what was in her "job description." Defendants' counsel asked:

> Q:    Were you honest in indicating the job duties you performed on your current resumé?
>
> A:    Yes.
>
> Q:    So, is it fair to say, then, that your current resumé accurately reflects job duties you performed at Burlington Coat Factory, at least for the time period of February 2009 through November 2011?
>
> A.    Yes.

*See* Shabazz Depo., at 31.

In countless responses to Defendants' statement of material undisputed facts, Plaintiff attempts to create disputes of fact where none exist. For example, Plaintiff testified in her deposition that she interviewed candidates and made hiring recommendations. *See*

6

Defendants' Statement Facts, ¶ 18 (citing Shabazz Depo., at 176-77). She interviewed between 10 and 20 candidates. *Id.* (citing Shabazz Depo., at 53-55). She made recommendations to the Store Manager about whether he should hire a candidate and could not recall an instance where the Store Manager did not follow her recommendation. *Id.*

Plaintiff attempts to "dispute" this by arguing that the Store Manager did most of the interviews and he had the sole authority to hire or fire. *See* Resp., ¶ 18 (citing Shabazz Depo., at 53). This response does not contradict the deposition testimony highlighted by Defendants. Defendants did not state that Plaintiff had the only authority to hire and fire in the store or that Plaintiff made the final decision on this matter. It is clear from Plaintiff's deposition testimony that she frequently interviewed candidates and made recommendations – that were followed – to the Store Manager about whom he should hire.

Similarly, Defendants point out that Plaintiff testified in her deposition testimony that she was responsible for managing the operations work schedule, including the schedule for the Customer Service Supervisors. *See* Defendants' Statement Facts, ¶ 19 (citing Shabazz Depo., at 145-47). She also reviewed the work schedules submitted by the Customer Service Supervisors, Customer Service Manager, and Receiving Supervisors who did scheduling for the Cashiers, Customer Service Cashiers, and Receiving Associates. *Id.* (citing Shabazz Depo., at 145-49). Plaintiff would modify the schedules as she thought necessary to assure adequate staffing and payroll. *Id.*

Plaintiff "disputes" these statements by contending that the Customer Service Manager and Receiving Supervisors actually scheduled the cashiers and the receiving team and that she would change the schedules only if she recognized there were too few employees scheduled for a weekend. *See* Resp., ¶ 19 (citing Shabazz Depo., at 147). Of course, this is precisely what Defendants' statement of facts set forth. Plaintiff reviewed the schedules submitted by the Customer Service Supervisors, Customer Service Manager, and Receiving Supervisors and made adjustments where she thought necessary thereby exercising her discretion in the matter.

Plaintiff testified that she participated in meetings with the Store Manager and Merchandise Manager where they would "sit down and we would discuss and, you know, for whatever reason, a particular person, and we would agree that, you know, maybe they need to part ways with the Company." *See* Defendants' Statement Facts, ¶ 24 (citing Shabazz Depo., at 209). Plaintiff testified that she, the Store Manager, and Merchandise Manager agreed to terminate at least two individuals. *Id.*

Plaintiff "disputes" this statement by arguing that she never "recommended" an employee for termination but was present in meetings where the Store Managers and other managers would discuss potential terminations. *See* Resp., ¶ 19 (citing Shabazz Depo., at 209-10). Again, Plaintiff's argument creates no dispute of fact. Plaintiff clearly stated that "we had probably all agreed that someone should be terminated and they were terminated."

8

*See* Shabazz Depo., at 209.  Plaintiff's stated that she did not recommend termination "by myself, but it was something we agreed upon." *Id.* at 210.  This is Plaintiff's undisputed testimony that she agreed that an employee should be terminated and the employee was terminated.

Plaintiff testified in her deposition that she "always made sure that everyone that I worked with, or worked with me, was, you know, was held accountable for what they had to do from their position." *See* Defendants' Statement Facts, ¶ 25 (citing Shabazz Depo., at 178-79).  She issued verbal and written discipline to employees for misconduct and violations. *Id.* (citing Shabazz Depo., at 84, 234-40, 241, 242-43, and 247).

Plaintiff attempts to "dispute" her testimony by stating that while she issued verbal and written counseling statements, she was not the "sole" counselor and she did not "enforce" Defendants' policies. *See* Resp., ¶ 25 (citing Shabazz Depo., at 241-42).  Whether she was the "sole" counselor is irrelevant.  Defendants never asserted that she was the only employee in the store who issued verbal and written counseling statements.  And by issuing those statements, Plaintiff is "enforcing" the policies of Defendants.

Finally, Plaintiff completed annual performance reviews for employees and conducted performance reviews with employees. *See* Defendants' Statement Facts, ¶ 26 (citing Shabazz Depo. at 247-50).  She would talk with employees about their weaknesses and strengths and "where they might need to build up." *Id.* (citing Shabazz Depo., at 251-

9

55).  Plaintiff attempts to "dispute" her own testimony by responding that those evaluations contained input from other managers and that the evaluations had to be in a specific format required by Defendants' policies and regulations.  *See* Resp., ¶ 26 (citing Shabazz Depo., at 196-97).  Again, Plaintiff's response does not "dispute" Defendants' statements.  The fact that other managers also had input into the evaluations does not mean Plaintiff, herself, did not participate as well.  Furthermore, the fact that the evaluations had to be in a format required by Burlington Coat Factory does nothing to diminish the fact that Plaintiff was responsible for completing the evaluation based on her observations of the employee.

These are but a few examples of the manner in which Plaintiff's counsel has unnecessarily complicated the adjudication of the case by attempting to "dispute" Plaintiff's very own deposition testimony through responses to Defendants' statement of facts.  The court has reviewed the entirety of Plaintiff's deposition.  The court's recitation of the facts below is drawn almost entirely from Plaintiff's own testimony; testimony that cannot be altered, improved, or massaged through a later-filed declaration or argument of Plaintiff's counsel in response to Defendants' motion for summary judgment.

**B.     Facts**

Burlington Coat Factory Warehouse Corporation is the corporate parent of Burlington Coat Factory Warehouse Corporation of Georgia, who employed Plaintiff.  Plaintiff started working for Defendants in 1992 as a cashier at the Buford Highway retail store and later the

Greenbriar retail store.  In 1995, Plaintiff was promoted to Customer Service Manager.  In 1997, she transferred to a district-wide administrative assistant position until 2004 when she became a Corporate Auditor.  Because that job required travel, Plaintiff eventually asked to be transferred back to a store.  In 2007, she transferred to Burlington's Southlake Parkway retail store in Morrow, Georgia, working as an Operations Manager.  She continued in this job until May 2011, when her job title changed to Customer Service Logistics Manager.  Plaintiff worked for Burlington until November 15, 2011, when she was fired for insubordination for taking a week off without permission during a "black out" holiday period when no leave would be granted.  *See* Shabazz Depo., at 98-102.  Plaintiff's salary was approximately $40,000 per year.

Between February 2009 and May 2011, the Southlake store employed seven management employees, including Plaintiff.  There was a Store Manager, an Operations Manager (Plaintiff), who was responsible for the day-to-day management of the Front-End and Receiving areas of the store, and two Merchandise Managers who were in charge of the day-to-day management of the sales departments.  The Operations Manager and the Merchandise Managers reported directly to the Store Manager.  Only the Store Manager was compensated based on the store's profitability.

Southlake also had two Area Managers who managed separate retail departments.  These Area Managers reported directly to a Merchandise Manager and a Customer Service

11

Manager who was responsible for supervising the Customer Service Supervisors and Cashiers and reported directly to Plaintiff in her capacity as Operations Manager.  *See* Shabazz Depo., at 112-15.  In May 2011, the Customer Service Manager and Area Manager positions were eliminated.  The Operations Manager position (Plaintiff) was transferred into the position of Customer Service Logistics Manager.  Thus, from May 2011 until November 2011, the Southlake store had four management employees: a Store Manager, a Customer Service Logistics Manager (Plaintiff), and two Merchandise Managers.

As Operations Manager, Plaintiff had responsibility for Accounting and Receiving and the day-to-day management of the Front-End and Back-End of the store. Plaintiff testified that she supervised "receiving, front end, and accounting;" "assisted the Store Manager with hiring;" "performed other daily functions, coaching teaching;" supervised, counseled, and disciplined employees; and "assisted the Store Manager in doing scheduling."  *See* Shabazz Depo., at 37-45, 53, 56, 59-60, and 73.  She testified that she issued directions to her subordinates.  *Id.* at 169.  Plaintiff had 18 to 19 employees reporting to her, including Receiving Supervisor, Receiving Associates, Cashiers, Customer Service Cashiers, Customer Service Supervisors, and the Customer Service Manager (until that position was eliminated in May 2011).  *Id.* at 131 and 155.  Plaintiff testified that she gave work instructions to the associates, supervisors, and managers whom she supervised.  *Id.* at

AO 72A
(Rev.8/82)

168-69.  She also was responsible for ensuring that her subordinate employees were correctly performing their jobs.  *Id.* at 131-32.

Plaintiff interviewed candidates for staffing positions and made hiring recommendations.  *Id.* at 176-77.  She interviewed between ten and twenty candidates.  *Id.* at 53-55.  Although the Store Manager made final decisions about hiring, Plaintiff testified that she could not recall any instance in which the Store Manager did not follow her recommendation.  *Id.*  Plaintiff recommended three of her employees to be promoted to supervisor or management positions and the Store Manager followed those recommendations.  *Id.* at 207-09.  She also was involved with making decisions to terminate employees.  *Id.*  Plaintiff issued verbal and written discipline to employees for failure to follow company policies.  *Id.* at 84, 234-38, 240-41, 242-43, and 247.  Plaintiff also completed annual reviews for employee performance.  *Id.* at 247.  As part of this process, Plaintiff met with employees and discussed their strengths and weaknesses.  *Id.* at 251-55.

Plaintiff was responsible for managing the operations work schedule including scheduling the Customer Service Supervisors.  *Id.* at 145-47.  Plaintiff reviewed the work schedules created by the Customer Service Supervisors, Customer Service Manager and Receiving Supervisor for the cashiers, the customer service cashiers, and receiving associates.  *Id.* at 145-49.  She would alter the presented schedules if she "thought [it] necessary," for example, if she thought there were too few employees scheduled to work on

13

a particular weekend.  *Id.*   Plaintiff agreed that it was her responsibility to make "sure that associates were scheduled properly" so that there was "enough coverage on the cashiers and we had enough coverage in receiving and so forth."  *Id.* at 193.

Plaintiff also testified that she was responsible for monitoring payroll and making sure that the store did not go over budget.  *Id.* at 45-46.  If it looked like the store would be going over budget, she would report this fact to the Store Manager.  *Id.* at 46-47.  If the Store Manager was not in the store, she and the other assistant manager would make decisions about cutting hours and calling employees to tell them not to come in.  *Id.* at 47. Plaintiff would recommend those decisions to the Store Manager and he would follow those recommendations.  *Id.* at 47-48. Plaintiff also supervised the accounting function of the store, including reconciling the bank, getting deposits ready, doing cash reports, and so forth.  *Id.* at 43-45.  Plaintiff trained associates on the timekeeping system and ensured that time was properly tabulated.  *Id.* at 83-84.  She performed tasks – such as editing time sheets – that hourly employees were not authorized to perform.  *Id.* at 84-85.  She was one of the managers who completed worker's compensation documents and reports.  *Id.* at 220-22.

Plaintiff was also responsible for training cashiers and other employees in the store. *Id.* at 56-59, 188-89.  Plaintiff would decide when cashiers or other employees needed to be retrained on certain issues.  *Id.* at 181-83.  She would conduct new employee orientation or if she was too busy, she instructed a subordinate employee to do the training and then

14

monitored the training.  *Id.* at 119-20, 225-27.  She would also enter confidential information, such as rate of pay, into the computer system for new employees.  *Id.* at 261. Hourly employees were not permitted to have access to this information.  *Id.* at 261-63.

In her own resumé, Plaintiff summarized the responsibilities of her position as "responsible for the day to day management of an 11 million dollar retail operation," "coordinating, staffing, payroll, and scheduling for over 100 associates," "supervised: Accounting Manager, Shipping and Receiving Manager, and the Loss Prevention Manager, and the Customer Service Supervisors," and "excellent Trainer, trained over 500 associates in the day-to-day operations of Burlington Coat Factory stores."  *See* Strawn Decl., Exh. 1.

## C.     Contentions

Defendants argue that Plaintiff is an exempt executive employee because the performance of management activities was her "primary activity," her work was relatively free from supervision; she earned significantly more than nonexempt employees; she exercised discretion; made recommendations concerning interviewing, hiring, promotions, terminations and these recommendations were given "particular weight;" she trained associates on timekeeping tasks and initial orientation; and Plaintiff scheduled employees for work and monitored payroll and budget.

Plaintiff responds that her managerial tasks were not her "primary duties" and she also performed the work of hourly associates doing such tasks as operating the cash registers

15

and unloading freight and that this nonexempt work "overwhelmed" Plaintiff. Plaintiff argues that the performance of nonexempt work took more than 50% of her time. Plaintiff further avers that she did not exercise a great deal of discretion as to her tasks. Plaintiff asserts that she is not an exempt employee because she received only a salary and was not eligible for any performance based bonuses.

## II.   Discussion

The Fair Labor Standards Act requires that employees be paid time and a half for hours worked in excess of a 40 hour workweek. *See* 219 U.S.C. § 207(a)(1). There are exemptions to this requirement, including an "executive exemption" which provides that the overtime requirements "shall not apply with respect to . . . any employee employed in a bona fide executive . . . capacity." *Id.*, § 29 U.S.C. § 213(a)(1). Defendant bears the burden of proving the executive exemption affirmative defense. *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1269 (11th Cir. 2008). Further, exemptions under the Fair Labor Standards Act should be narrowly construed. *Id.*

The Department of Labor has promulgated regulations which interpret the "executive exemption." *Id.* at 1265-66. To establish that an employee is a bona fide executive, an employer must demonstrate:

> (1) the employee is compensated on a salary basis at a rate of not less than $455 per week; (2) the employee's primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department of subdivision thereof; (3) the employee customarily and regularly

16

directs the work of two or more other employees; and (4) the employee has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

*Id.* at 1266 (citing 29 C.F.R. § 541.100(a) (2006).

Examples of managerial tasks include:

Interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing their work; maintaining their production or sales records for use in supervision or control; appraising their productivity and efficiency for the purpose of recommending promotions or other changes in their status; handling their complaints and grievances and disciplining them when necessary; planning the work; determining the techniques to be used; apportioning the work among the workers; determining the type of materials, supplies, machinery or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety of the men and the property.

*Id.* at 1267 (citing 29 C.F.R. § 541.102(b) (2003). In 2006, new regulations added the tasks of "planning and controlling the budget; and monitoring or implementing legal compliance measures." *Id.* (citing 29 C.F.R. § 541.102 (2006)).

A "primary duty" means the "principal, main, major or most important duty that the employee performs." *Id.* at 1268 (citing 29 C.F.R. § 541.700 (2006)). Whether these are "primary duties" must be "based on all the facts in a particular case" and the determination must be made "with the major emphasis on the character of the employee's job as a whole." *Id.* (citing 29 C.F.R. § 541.700 (2006)). Factors to consider in this analysis are: "the relative importance of the exempt duties as compared with other types of duties; the amount of time

17

spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee." *Id.* at 1268 n.53 (citing 29 C.F.R. § 541.700(a) (2006)).

With respect to the time-spent-on-exempt-work factor, the regulations state that this "can be a useful guide in determining whether exempt work is the primary duty of an employee" and that "employees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement." *Id.* (citing 29 C.F.R. § 541.700(b)( (2006)). The regulations also state, however, that "[t]ime alone" is "not the sole test" and "[e]mployees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other factors support such a conclusion." *Id.* Further, "[c]oncurrent performance of exempt and nonexempt work does not disqualify an employee from the executive exemption if the requirements of § 541.100 are otherwise met." *Id.* (citing 29 C.F.R. 541.106(a) (2006)). "Whether an employee meets the requirements of § 541.100 when the employee performs concurrent duties is determined on a case-by-case basis and is based on the factors set forth in § 541.700(a). *Id.* at 1268-69 (citing 29 C.F.R. 541.106(a) (2006)).

As one might expect after reading these regulations, there is no "categorical approach" to determining the executive exemption and the "answer is in the details." *Id.* at

1269.  In fact, "courts recognize that time spent performing non-managerial duties is not

determinative under the short test, but rather, the employee's primary duty is what she does

that is of principal value to the employer, not the collateral tasks that she may also perform,

even if they consume more than half her time."  *See*, *e.g.*, *Jackson v. Advance Auto Parts,*

*Inc.*, 362 F. Supp. 2d 1323, 1334 (N.D. Ga. 2005) (Cooper, J.) (citing *Dalheim v. KDFW-*

*TV*, 918 F.2d 1220, 1227 (5th Cir. 1990) and *Reich v. Wyoming*, 993 F.2d 739, 742 (10th

Cir. 1993)).  In *Jackson*, the plaintiffs had testified in a similar manner to Plaintiff here, but

the court rejected the argument that the performance of hourly tasks rendered the executive

exemption inapplicable.  "[D]espite their contention that they spent the bulk or the majority

of their time performing non-managerial duties, such duties were performed simultaneously

with their managerial functions.  Indeed, each of the Plaintiffs acknowledged at their

depositions that while they were selling to customers, operating the register, or performing

other incidental tasks, they were also still overseeing the other employees in the store and

making sure that the store was operating properly."  *Id.* at 1335.  Plaintiff's arguments here

are remarkably similar to those raised by the plaintiffs in *Jackson* and rejected by the court.

Significantly, the regulations recognize that in retail establishments, managerial

employees will often be asked to perform hourly tasks.  They provide:

> assistant managers in a retail establishment who perform exempt executive
> work such as supervising and directing the work of other employees, ordering
> merchandise, managing the budget and authorizing payment of bills may have
> management as their primary duty even if the assistant managers spend more

19

> than 50 percent of the time performing nonexempt work such as running the cash register.  However, if such assistant managers are closely supervised and earn little more than the nonexempt employees, the assistant managers generally would not satisfy the primary duty requirement.

29 C.F.R. § 541.700(c); *see also* 29 C.F.R. § 541.106(b) ("An exempt employee can also simultaneously direct the work of other employees and stock shelves.").

Here, there is no dispute that Plaintiff was paid above the $455 per week threshold required by the FLSA to qualify for an executive exemption.  Although Plaintiff argues several times that only the Store Manager was eligible to have his compensation enhanced based on the profitability of the store, this is not a factor among those to be considered when determining whether an employee is an exempt executive.  Plaintiff's salary was approximately $40,000 per year which equates to a weekly salary of $769, well above the $455 threshold and well above the hourly associates who were paid between $7.25 and $8.25 per hour.

Plaintiff's testimony clearly demonstrates that she performed numerous management functions.  Plaintiff interviewed candidates for employment and made hiring recommendations which were followed and thus given "particular weight;" she recommended subordinate employees for promotion and those recommendations were followed; she completed performance reviews of employees; she counseled and disciplined associates and participated in decisions to terminate employees; she delegated work and training to subordinates; she scheduled the work hours of supervisors and monitored the

scheduling of other employees, including changes the schedules proposed by other supervisors; she monitored the store's compliance with payroll, including making recommendations to the Store Manager about cutting back hours; and she completed documentation with respect to worker's compensation and unemployment compensation. These are all management functions which demonstrate that Plaintiff exercised discretion and was relatively free from supervision. Furthermore, Plaintiff clearly supervised more than two employees.

In fact, Plaintiff does not and cannot dispute that she performed management functions; she argues mainly that these activities were not her "primary duty." Plaintiff, herself, however, testified that even when she was doing work in receiving or working cash registers out front, she would still be doing managerial work. *See* Shabazz Depo., at 230 (even when "working in receiving or out on the floor or cash registers" . . . "if someone approaches me and asks me or needed some assistance as a manager, yes" she still had her "managerial eye out"). She might not always stop immediately "unless they were just out of hand, unless it was something that was – that needed management attention and I was there, then I would address it." *Id.* at 231. She agreed that even when she was working the floor, or receiving, or the cash registers, she "still had managerial responsibility." *Id.*

Plaintiff further testified:

Q:     But even at times when you were working with either a merchandise manager or a store manager, you still had managerial responsibilities, right?

A:     Yes.  I'm not saying that I didn't.  You know, I did my managerial functions, however, you know, I will be on the floor.  I wasn't – it wasn't like I was sitting in the office all the time doing paperwork, or you know, writing up people, doing things, you know, doing separation notices or evaluation, I was not always – I wasn't an office manager.  So, you know, I would – I'm a worker like everybody else.  I get out there, get on the floor, go to receiving, you know, run the register.  Mostly, I say receiving so much because that's where I would spend a lot of my time in receiving.

Q:     And even when you're in receiving, you're still a manager, right, and you still have managerial responsibilities to make sure that the people underneath you are either direct or indirect reports are doing their jobs correctly, right?

A:     Well, when I'm in receiving, I can't see what – I'm not saying that I'm not a manager, but when I'm back there functioning, you know, working, I'm not – I'm not - I'm not thinking about wearing a management hat, I'm working.

Q:     Right.

A:     So – but, like I said, however, if someone comes to me with an issue or a concern, then if I have to step away from doing that to go handle that, that's what I do.

Q:     Right.  And because that would be  – because it would be more important that you address that concern or handle that issue and get it taken care of, right?

A:     At the time.

22

> Q:      Right.  Because you are a go to manager to get that done, right?
>
> A:      At that time, if that's needed, then yes, at that time.
> . . .
>
> Q:      But first, it was more important for you to deal with that managerial issue or question, right?
>
> A:      Yes, I mean, yes.  If they come to me, yes, I have to do that.
>
> Q:      Right.  Because you're not going to delegate the managerial issues to a regular hourly associate, right.
>
> A:      Of course not.

*Id.* at 137-40.  This testimony makes clear that even though Plaintiff would sometimes perform non-managerial tasks, she would always concurrently be fulfilling her role as manager.  It is clear from this testimony that her function as a manager was far more important to the well-being of the store than the non-managerial work she performed.

Plaintiff argues, however, that the Eleventh Circuit's holding in *Family Dollar* where the court found that the jury had sufficient evidence before it to conclude that the employees were not exempt, should counsel against a finding of "primary duty."  In *Family Dollar*, the plaintiffs had amassed evidence and testimony that 80-90% of their time was spent on non exempt manual labor.  *Id.* at 1269.  Even the job descriptions provided by Family Dollar listed mainly work of a hourly employee.  Such "manual tasks" were not "incidental," but rather "essential."  *Id.* at 1270.  This manual labor was essential to the business model because the budget did not allow for the hiring of sufficient hourly employees to fulfill the

AO 72A
(Rev.8/82)

manual labor demands.  *Id.*  The employees did not exercise any discretion because the manuals and corporate directives "micromanaged the days and hours of store operations, the number of key sets for each store, who may possess the key sets, entire store layouts, the selection, presentation, and pricing of merchandise, promotions, payroll budgets, and staffing levels."  *Id.*  The manuals even included instruction on how to arrange clip boards and what items should go in which drawers of file cabinets.  *Id.*  Only the district manager who oversaw 10 to 30 stores could change store hours, layouts, or budgets.  *Id.* at 1270-71. The store managers themselves had no freedom from this supervision.  *Id.* at 1271.

Plaintiff hopes to convince the court that her case is like the plaintiffs' case in *Family Dollar* through repetition of her generalized declaration statement that she was "frequently" so busy with nonexempt work that others were forced to take on her management duties. But as the court has explained above, Plaintiff's declaration cannot alter her own description of responsibilities in her job resumé, a resumé she confirmed at deposition was an accurate and honest reflection of her job responsibilities.  Nor can Plaintiff testify five times in her deposition that she was unable to give any assessment of how much time she spent in exempt as opposed to nonexempt tasks and then state in a declaration that she "frequently" could perform only the tasks of an hourly worker.  Moreover, the procedural posture in this case is not a review of a jury verdict in favor of the plaintiffs.

Most significantly, Plaintiff has not adduced any evidence of the sort in this case as was presented in *Family Dollar*.  The gravamen of Plaintiff's deposition testimony is that

she was a busy employee.  Throughout her deposition, however, Plaintiff never denied that she fulfilled all of her management functions.  Plaintiff stated: "You know, besides from doing the so-called manager duties, I was also – I was a worker.  I was a, you know, working alongside the hourly associates and everything. . . . So I was not just a – in the so-called manager role, I was also working with, you know, the associates as well."  *See* Shabazz Depo., at 61.

In contrast, Defendants point to the case of *Morell v. Burlington Coat Factory Warehouse of Dolphin, Inc.*, No. 03-12450, (11th Cir. Dec. 10, 2003) (unpublished opinion), where the plaintiff was hired to manage the Baby Depot department of a Burlington Coat Factory store.  The plaintiff supervised six sales associates and performed duties of: interviewing candidates for employment, directing the work and setting schedules for his subordinates, maintaining records of sales and employees' productivity, handling grievances, complaints, and disciplinary matters.  But the plaintiff also testified that he spent 80 to 90 percent of his time performing the same work as the sales associates he supervised.  *See* Slip op., at 7-8.  The court found that while the regulations mentioned a 50 percent line, it was "not necessarily true that an employee who spends less than 50 percent of his or her time performing managerial duties would not have management as his or her primary duty."  *Id.* at 8-9.

The court recognized that "Morell's management duties were necessary to the smooth operation of the Baby Depot and were of greater importance to Burlington than his non-

exempt duties, which could have been performed by any sales associate earning six dollars per hour." *Id.* at 9. Furthermore, while "Morell did not have the final say in many decisions, including hiring and purchasing, his position was vested with enough discretionary power to qualify for the executive exemption." *Id.* at 10 (noting that Morell chose candidates to interview, recommended purchases to buyers, granting customer discounts on damaged merchandise, and delegated tasks to subordinates). "The fact that Morell was subject to supervision by Burlington's upper management does not invalidate his managerial role." *Id.* at 11. *See also Diaz v. Team Oney, Inc.*, 291 Fed. Appx. 947 (11th Cir. 2008) (employee exempt because his duties of supervising and apportioning work, making deposits, interviewing employees were "significantly more important to the operation of the restaurant than his non-managerial tasks" of making and cutting pizzas, routing delivery of pizzas, greeting customers and cleaning store; further noting that even though he could not make final decisions on hiring and firing, he would make recommendations on these topics to store manager; and employee testified he was "in charge" of restaurant when store manager was not present).

 For the foregoing reasons, the court finds that Plaintiff's testimony clearly establishes that Plaintiff performed management tasks and to the extent that Plaintiff performed non-managerial tasks, her "primary duty" was still management. Plaintiff has adduced no dispute of fact with respect to the application of the executive exemption under the Fair Labor Standards Act. Therefore, the court GRANTS Defendants' motion for summary

judgment and find that Plaintiff is exempt under the Act.  Because Plaintiff is exempt, the court need not consider whether Defendants complied with any paperwork requirements for determining hours worked.

**III.    Conclusion**

The court GRANTS Defendant's motion for summary judgment [27].

The Clerk of the Court is DIRECTED to DISMISS WITH PREJUDICE Plaintiff's complaint.

**IT IS SO ORDERED** this 12th day of February, 2013.


_____S/   J. Owen Forrester_____
J. OWEN FORRESTER
SENIOR UNITED STATES DISTRICT JUDGE

AO 72A
(Rev.8/82)